# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**THIS PLEADING APPLIES TO:**
JEFFREY LANE HERRING, JR.

**PLAINTIFF**

**VS.**                                    **CIVIL ACTION NO.:** 1:19-CV-941-LG-RHW

**BP EXPLORATION & PRODUCTION INC.**
**AND BP AMERICA PRODUCTION COMPANY**                    **DEFENDANTS**

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO EXCLUDE AND FOR ORDER TO SHOW CAUSE

---

*The issues addressed herein apply to 459 individual BELO cases pending in the United States District Court for the Southern District of Mississippi as of December 26, 2019.  To preserve judicial resources, and those of the parties, Defendants have drafted two versions of the same motion, dividing the 459 cases into two groups based on judicial assignments.  The instant pleading applies to the 236 BELO actions assigned to this Honorable Court.  *See* Exhibit A, Listing of 236 BELO Actions Subject to the Instant Motion.  The second applies to the remaining 223 BELO actions, assigned to the Honorable Sul Ozerden, and has been filed simultaneously in those matters.  The Nations Law Firm serves as counsel of record for Plaintiffs in all 459 actions.

**BRIEF SUMMARY OF RELIEF REQUESTED HEREIN**

Discovery in these Back-End Litigation Option ("BELO") cases has revealed that The Nations Law Firm[1] ("Nations") designed and implemented a multi-jurisdictional scheme (the "Nations Syndicate") to manufacture "diagnoses" as the bases for their clients' personal injury claims against BP Exploration and Production, Inc. and BP America Production Company (collectively "BP"). To date, BP has identified 26 doctors[2] across four Gulf States (Mississippi, Florida, Louisiana, and Alabama) who were retained by Nations to purportedly "examine" thousands of its clients.

As a critical component of its scheme, Nations provided the syndicate doctors with *pre-populated* diagnostic forms ("Nations Syndicate Forms") for each of its clients to ensure positive findings. Nations prepared and filled in these forms *before* their clients met with the doctors, and in a manner that upon review by the clinician resulted in a positive diagnosis rate of 100%. As a result, there are now thousands of BELO lawsuits in the federal court system based solely on "diagnoses" bought and paid for by the lawyers who filed them.

459 BELO cases pending in the United States District Court for the Southern District of Mississippi as of December 26, 2019 are based on alleged "diagnoses" reflected in the standard set of pre-typed, pre-filled, attorney-supplied Nations Syndicate Forms purportedly signed by one of two Mississippi doctors - Rick D. Hoover, D.O. of Gautier, Mississippi ("Dr. Hoover") or James B. Martin, M.D. of Ocean Springs, Mississippi ("Dr. Martin"). In response to their obligations under the BELO Initial Proceedings Case Management Order in the MDL, each of

---

[1] The Nations Law Firm associated other external counsel, individuals, and third-party entities to assist in the BP claims process. They are collectively referred to herein as ("Nations").

[2] Organized by state, the 26 doctors include: (1) Mississippi - Dr. James B. Martin, Dr. Rick D. Hoover, and Dr. Francisco Camero; (2) Louisiana - Dr. Jyoti Chakraborti, Dr. R.M. Haydel, Dr. Scott Haydel, Dr. Alex Hoang, Dr. Charlie Le, Dr. Jeffrey Poole, Dr. Dung Michael Tran; (3) Alabama - Dr. Ellis Allen, Dr. Raymond Broughton, Dr. Robert Gray, Dr. Gary Kolb, Dr. Oscar Lopez, Dr. Michael Lyons, Dr. Howard Rubenstein, Dr. Richard Snellgrove; and, (4) Florida - Dr. Don Buckley, Dr. Janice Buckley, Dr. Nicholas Delgado, Dr. Vincent Ivers, Dr. Marta Jacenyik, Dr. Donna Judson, Dr. Dr. Krzysztof Lewandowski, and (allegedly) Dr. Gary Gotthelf.

the 459 Plaintiffs produced these forms as the medical "proof" on which their BELO lawsuits are based.[3] Yet, discovery has revealed that these two physicians:

(1)     did not have a physician-patient relationship with the Nations clients;

(2)     do not know which Nations clients they actually evaluated;

(3)     did not maintain a list of Nations clients escorted to their clinics;

(4)     did not verify a single person's identity before evaluation;

(5)     intentionally, per their agreement with Nations, did not retain a copy of any documentation reflecting their findings;

(6)     relied upon inadequate "medical" information (contained on the pre-populated Nations Syndicate Forms, collected by unknown Nations case managers), did not review any medical records, and did not complete their own thorough evaluations to determine the accuracy of the information provided;

(7)     were instructed by Nations to report symptoms that *were not actually present on physical exam and followed those instructions*;

(8)     failed to use any "diagnostic criteria" other than those dictated by Nations;

(9)     did not follow the standards generally accepted in the medical community (or even within their own medical practices) in signing-off on the pre-determined findings in the Nations Syndicate Forms; and,

(10)    admitted they would not qualify in federal court to render expert opinions on diagnosis and causation in these BELO cases.

The fact of a medical diagnosis is critical to, and forms the basis for, every BELO claim. Yet, based on the foregoing, none of the "findings" of these two syndicate doctors constitute an actual, reliable, or admissible diagnosis for any of the Plaintiffs. Describing their work under the Nations Syndicate as "rather cursory" and agreeing it was specifically "tailored to the needs of the lawyers and the law firm," Dr. Martin candidly confessed under oath: "[T]his examination

---

[3] The CMO governing BELO cases in the MDL mandates each BELO Plaintiff, prior to venue transfer, complete and file, under penalty of perjury, a Plaintiff Profile Form (similar in nature to interrogatory responses) which requires, *inter alia*, that: (1) the plaintiff identify the doctor or provider who diagnosed the underlying LMPCs for which they are seeking compensation; (2) the plaintiff produce the underlying diagnostic records proving that diagnosis, and, (3) the plaintiff identify the doctor or provider with whom they discussed the "cause" of their alleged LMPC. *See BELO Initial Proceedings Case Management Order*, January 30, 2015, Rec. Doc. 14099, Case 2:10-md-02179 (E.D. La.) ("BELO CMO"). For each plaintiff subject to the instant motion, either Dr. Hoover or Dr. Martin was identified as the physician who diagnosed their underlying LMPCs and with whom they discussed causation. The Nations Syndicate Forms were submitted as proof of those "diagnoses." They are collectively attached hereto as Exhibit B, Nations Syndicate Forms Produced by 459 BELO Plaintiffs Purportedly Diagnosed by Either Dr. Hoover or Dr. Martin ("Plaintiff Forms").

that we did on these people . . .is not that all-encompassing.  This is a . . . screening thing only. . . .And when you talk about diagnoses and that sort of thing, ***I'm not sure [that] you can refer to these things as diagnoses.***"[4]  In fact, when asked directly about the hundreds of "diagnoses" they purportedly rendered, including those of the 236 Plaintiffs at issue in the instant pleading, Dr. Martin summarily answered as follows:[5]

> **Q.** **[W]ould it be fair to say that you would not consider the findings on any of the forms for any of the Nations clients to be formal diagnoses?**
>
> **A.** **Correct.**

Admissions such as these, coupled with the additional facts presented herein, clearly place the veracity of every diagnostic opinion purportedly rendered by Dr. Hoover or Dr. Martin under the Nations Syndicate scheme "at issue."  They also render the testimony of Drs. Hoover and Martin (including that in the form of the unauthenticated "diagnoses" produced by each Plaintiff herein) unreliable and inadmissible under Rules 702, 802, and 901 of the Federal Rules of Evidence.  Notably, Nations has already dismissed hundreds of other BELO cases based on unsubstantiated diagnoses in Nations Syndicate Forms, including recently 351 cases in the Northern District of Florida involving the purported 26th doctor in the Nations Syndicate, Dr. Gary Gotthelf.  Dr. Gotthelf testified under oath that he did not, in fact, examine, evaluate, or diagnose any Nations clients, nor did he sign any of the Nations Syndicate Forms on which his alleged signature appeared.[6]  All 351 of the Gotthelf "diagnosed" claims have now been voluntarily dismissed by Nations.

---

[4] Exhibit C, Deposition of James B. Martin, M.D., *Katrina Kreeger v. BP Exploration & Prod. Inc., et al.*, Case 1:19cv0077-LG-RHW (November 8, 2019) ("Martin Dep.") at 71:12-18; 75:6-14.
[5] Martin Dep. at 76:15-19.
[6] *See* Exhibit D, Good Faith Correspondence to Howard Nations (October 31, 2019).  Instead, Dr. Gotthelf testified that it was his physician assistant who was engaged by Nations to do that work, that he had no knowledge Nations was representing to anyone that he was engaged to do so, and that he had no knowledge Nations was representing to anyone that he had diagnosed their clients.  *Id.*

In lieu of voluntary dismissals in the instant cases, this Court has the inherent power to control its docket and judicial resources through pre-trial rulings that winnow out non-meritorious cases. BP, therefore, respectfully prays this Court enters an order: (1) excluding the opinion testimony of Drs. Hoover and Martin (including that in the form of the purported findings and "diagnoses" contained in the unauthenticated Nations Syndicate Forms produced by Plaintiffs in these matters) as unreliable and inadmissible under Rules 702, 802, and 901 of the Federal Rules of Evidence; and (2) requiring Plaintiffs whose BELO lawsuits are founded upon these purported "diagnoses" to show cause why their claims should not be dismissed.

## I.  BACKGROUND INFORMATION REGARDING THE BELO PROCESS

Each of the 236 Plaintiffs subject to this motion brought their action pursuant to the BELO provisions of the *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement ("MSA").[7] The MSA provides a comprehensive structure to address the claims of response workers and coastal residents who allege exposure-related injuries as a result of the *Deepwater Horizon* oil spill and clean-up efforts. *See* Reasons Order at 6. The agreement provides a range of benefits including, but not limited to: 1) set compensation for Class Members with a Specified Physical Condition ("SPC") based upon a determination by an independent claims administrator; and, 2) a modified litigation process, known as the Back-End Litigation Option ("BELO"), for Class Members asserting a Later-Manifested Physical Condition ("LMPC"). *See Id* at 8; MSA § IV, VI-IX. The instant cases are before this Honorable Court as BELO lawsuits.

---

[7] *See* Order and Reasons Approving the Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, Rec. Doc. 8217, Case 2:10-md-02179 (E.D. La. January 11, 2013) ("Reasons Order") at 6; *Deepwater Horizon* Medical Benefits Class Action Settlement Agreement, as Amended on May 1, 2012, Rec. Doc. 6427-1, Case 2:10-md-02179 (E.D. La) ("MSA").

To recover for a Specified Physical Condition claim under the MSA, Class Members must establish, as a threshold matter, that they: (1) manifested symptoms within 24-72 hours of exposure and 2) were first diagnosed *prior to April 16, 2012* with one or more of the specified acute and/or chronic conditions listed in Exhibit 8 to the agreement.[8]   Defendants agreed to pay fixed amounts (negotiated by the parties and approved by the Court) for these SPCs based solely upon a determination by an independent Claims Administrator upon submission of certain class membership and medical documentation. *See* MSA at § VI and Exhibit 8 thereto.  Because of the set compensation schedule and proximity of the diagnosis date to the *Deepwater Horizon* spill, the medical proof requirements for SPC claims were significantly reduced.[9]

Additionally, the MSA provides the Back-End Litigation Option, a streamlined litigation process, for Class Members seeking compensation for a Later Manifested Physical Condition - defined by the MSA as a physical condition first diagnosed <u>after</u> April 16, 2012.[10]   Under the BELO process, Class Members must submit a Notice of Intent to Sue ("NOIS") to the Claims Administrator within four years of either the first diagnosis of their alleged LMPC or the Effective Date of the MSA, whichever is later.  *See* MSA § VIII.  The NOIS must contain a description of the LMPC alleged and a physician's certificate or diagnostic record matching that description. *See Id.*

---

[8] *See* MSA at § VI, Exhibit 8; *See* Order Regarding Medical Benefits Settlement - Policy Statement on Classification of Chronic Physical Conditions First Diagnosed After April 16, 2012, Rec. Doc. 13179, Case 2:10-md-02179 (E.D. La. July 23, 2014) ("SPC-LMPC Date Order") at 3-6.  Class Members who believed they qualified for compensation could submit claims to Garretson Resolution Group ("GRG"), the jointly retained MSA third-party Claims Administrator, who controlled the review and payment process for SPC claims.  *See* MSA at § VI.

[9] *See* Ex. 8 to MSA.  Moreover, the level of compensation a qualifying Class Member received for a SPC claim depended upon various factors including, but not limited to: the Class Member's status as a Clean-Up Worker or Resident; whether the SPC was Acute or Chronic (with chronic conditions receiving exponentially higher compensation); and, the type of proof the Class Member presents.  *See* Reasons Order at 8; MSA § VI, Ex. 8.

[10] *See* Reasons Order at 16; MSA § VIII.  Alternatively, a Class Member could choose to pursue damages for an LMPC claim through workers' compensation law or the Longshore and Harbor Workers' Compensation Act instead of a direct BELO action against Defendants.  MSA § VIII.

The Claims Administrator reviews the diagnostic records submitted with the NOIS to confirm only that the wording included on the claimant's NOIS (setting forth the claimed LMPC condition and date of first diagnosis) matches the wording in the underlying record submitted. The Claims Administrator *does not* determine whether those diagnoses are proper, admissible, or (even) legitimate. *See* MSA § VIII.C.1. Per the terms of the MSA, that determination is left to the crucible of the adversarial process where a person or entity other than the Claims Administrator (namely, this Honorable Court) is responsible for evaluating the merits of a BELO claim.[11]

## II. ATTORNEY-CONTROLLED AND FUNDED DIAGNOSTIC SCHEMES, LIKE THE NATIONS SYNDICATE, ARE INHERENTLY SUSPECT AND UNRELIABLE.

Multi-plaintiff, mass tort litigation has long been plagued by rumors of corruption with no aspect of the litigation more in question than mass screenings for "potential" clients - or, as is often the case, for potential "diagnoses" of clients already recruited and promised compensation by their counsel.[12] The Honorable Judge Janice Graham Jack in MDL No. 1553 famously addressed the egregious conduct and suspect nature of attorney-sponsored mass tort screenings when she wrote:[13]

---

[11] *See* MSA § VIII. Once the Claims Administrator confirms a potential BELO Plaintiff's class membership and that the requisite paperwork has been submitted, the NOIS is declared "valid" and the materials are passed on to BP for mediation consideration. Should BP choose not to mediate the claim, the Class Member has six months in which to file their BELO lawsuit, wherein the issues to be litigated are limited by contractual agreement in the MSA, which expressly identifies six triable "issues, elements, and proof" in BELO cases. *See* MSA § VIII. Here, Defendants' motion focuses on the first of those triable issues:"1) The *fact of diagnosis* (i.e. *whether the Class Member was correctly diagnosed with the alleged LMPC*)" MSA § VIII.G.3 (emphasis added).

[12] Lester Brickman, professor of law at Benjamin N. Cardozo School of Law, previously conducted an extensive study of the doctors implicated in the asbestos and silica screening scandals, and has detailed many of the practices which underlie the mass production of highly suspect claims. These practices and procedures, so often criticized by Courts and scholars, are disappointingly similar to those at issue in the mass recruitment, screening, and diagnosis of BELO plaintiffs in the present litigation. *See* Lester Brickman, *On the Theory Class's Theories of Asbestos Litigation: The Disconnect Between Scholarship and Reality*, 31 Pepp. L. Rev. 33, 59-103 (2004).

[13] *In Re: Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 634-35 (S.D. Tex. 2005) ("Silica Opinion") (emphasis added).

This is ***assembly line diagnosing***. And it is an ingenious method of grossly inflating the number of positive diagnoses. . . .

In the ***majority of cases, these diagnoses are more the creation of lawyers than of doctors***. . . .

[T]hese ***diagnoses were about litigation rather than health care***. And yet this statement, while true, overestimates the motives of the people who engineered them. The word 'litigation' implies (or should imply) the search for truth and the quest for justice. ***But it is apparent that truth and justice had very little to do with these diagnoses - otherwise more effort would have been devoted to ensuring they were accurate. Instead, these diagnoses were driven by neither health nor justice: they were manufactured for money. The record does not reveal who originally devised this scheme, but it is clear the lawyers, doctors and screening companies were all willing participants***.

As Judge Jack noted, some lawyers are such willing participants in these schemes that they would "*determine[] first what disease [the screening companies] would search for and then what criteria would be used for diagnosing that disease*." Silica Opinion at 634-35 (emphasis added). These factors, understandably upsetting to Judge Jack, eerily echo the machinations of the Nations Syndicate in the instant cases.

### A. The Nations Syndicate Scheme Was Originally Created to Purchase Diagnoses to Obtain SPC Compensation.

The Nations Syndicate scheme was created to manufacture diagnostic records to support claims for SPC compensation - a process that directly defies the warnings contained in Judge Jack's seminal opinion on these issues. Nations erroneously[14] assumed the firm could manufacture "diagnoses" for their clients years after the April 16, 2012 SPC cut-off date and submit those records as the bases for compensation claims under the less stringent, Claims

---

[14] On May 13, 2014, the Claims Administrator filed its initial policy statement regarding the treatment of claims diagnosed after April 16, 2012 (*see* GRG Policy Statement on Classification of Chronic Physical Conditions First Diagnosed After April 16, 2012, Rec. Doc. 12862, Case 2:10-md-02179 (E.D.La. May 13, 2014)), which was later adopted by the MDL Court on July 23, 2014. *See* SPC-LMPC Date Order at 3-6. On August 20, 2014, Nations filed a memorandum brief in support of Class Counsel's motion for reconsideration of that order (*see* The Nations Law Firm's Memorandum Brief in Support of Class Counsel's Motion for Reconsideration, Rec. Doc. 13308, Case 2:10-md-02179 (E.D. La. Aug. 20, 2014)) which was ultimately denied by Court order on November 26, 2014. *See* Order, Rec. Doc. 13733, Case 2:10-md-02179 (E.D. La. Nov. 26, 2014).

Administrator-controlled SPC process. The Nations Syndicate Forms explicitly confirm that this scheme was originally concocted to pursue SPC compensation under the MSA, as the last page in every set contained the following excerpt specifically declaring that the "purpose of the examination" for each of the Nations clients was to qualify for SPC compensation:[15]

> This document is an Independent Medical Examination. The purpose of the examination and review of medical history is to determine whether this former BP Oil Spill Clean- Up Worker suffers from one or more Specified Chronic Physical Conditions or a qualifying Acute Condition listed within the Specified Physical Condition Matrix of the BP Medical Benefits Settlement Class Action.

The forms also contained *pre-typed* medical histories, symptomology, and causation findings, as well as *pre-populated* diagnostic options (in a circle-your-selection format) that correlated with those conditions identified in the SPC Matrix of the MSA.[16]

Nonetheless, because these alleged "diagnoses" first occurred years after April 16, 2012 (the cut-off date for determining whether a condition is an SPC or LMPC), these conditions ultimately would have been rejected as SPC submissions - leaving the Back-End-Litigation Option as the only remaining remedy through which the Nations Syndicate could pursue compensation under their scheme. These misguided efforts to access SPC funds and then repurpose the *same set of "circle-the-diagnosis" Nations Syndicate Forms* in an attempt to recover through the BELO process, have resulted in the filing of thousands of claims on federal court dockets throughout the Gulf States - including the 236 lawsuits subject to this motion. Significant expenditures of Court and party resources are inevitable if these unsubstantiated claims are allowed to continue without credible proof of the veracity of each diagnosis.[17]

---

[15] Given the nature of these documents, any one set of Nations Syndicate Forms can serve as an exemplar for all. Excerpts of forms for the two cases in which Drs. Hoover and Martin provided recent deposition testimony are used throughout this brief as demonstrative aides in order to highlight the severe deficiencies in their (and the entire Nations Syndicate) process. *See* Exhibit E, Exemplar Forms Produced by Plaintiffs Lamarice Riley and Katrina Kreeger ("Exemplar Forms") at 8, 16.

[16] *See* Exemplar Forms at 2-5, 7, 10-13, 15; MSA at § VI, Exhibit 8; *see generally* Plaintiff Forms.

[17] As the Honorable Eduardo C. Robreno of MDL 875 once noted, "[r]egardless of the amount of judicial effort and resources, unless the court establishes a toll gate at which entrance to the litigation is controlled, non-meritorious

**B. The Nations Syndicate Forms Were Designed and Pre-Populated to Ensure Positive "Diagnoses" of SPC Matrix Conditions.**

The "cookie-cutter" nature of the Nations Syndicate Forms clearly demonstrates not only that Nations exercised complete control over their substance and content, but also that they were intentionally designed and pre-populated to ensure positive "diagnoses" of SPC Matrix conditions.

**1. The Nations Syndicate Forms Limited the Pre-Populated Diagnostic Options to Those That Qualified for SPC Compensation.**

The typical set of Nations Syndicate Forms consists of: (1) a Dermatologic "circle-the-diagnosis" Page; (2) a Respiratory "circle-the-diagnosis" Page (with or without a pulmonary function test); (3) a Sinus "circle-the-diagnosis" Page (with or without an endoscopic test result); (4) an Ocular "circle-the-diagnosis" Page; and, (5) a Signature Page - purportedly executed by the plaintiff and one of two Nurse Practitioners employed by Nations in California. *See* Plaintiff Forms. Perhaps the most telling aspect of these forms is that each systems page (*i.e.*, dermatologic, respiratory, sinus, and ocular) contained a pre-defined, pre-populated set of "diagnostic options" chosen by the lawyers and provided to Nations Syndicate doctors, like Drs. Hoover and Martin.[18] These pre-determined diagnostic choices (and the symptomology/testing options included with them) are shockingly limited and wholly inconsistent with generally accepted diagnostic criteria in the medical community.[19] It is clear the Nations Syndicate Forms

---

cases will clog the process. Therefore, courts must establish procedures by which, at an early point, each plaintiff is required to provide facts which support the claim through expert diagnostics reports or risk dismissal of the case." Hon. Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (Mdl-875): Black Hole or New Paradigm?*, 23 Widener L.J. 97, 186–87 (2013). The "court will therefore entertain motions and conduct such hearings as may be necessary to resolve questions of evidentiary sufficiency in non-malignant cases supported only by the results of mass screenings which allegedly fail to comport with acceptable screening standards." Amended Administrative Order No. 12, *In re: Asbestos Prod. Liability*, 2:01-md-00875, Rec. Doc. 6645 (E.D. Pa. September 3, 2009).

[18] *See* Hoover Dep. at 77:19-25; Martin Dep. at 47:22-48:6.

[19] For example, on the Respiratory Page, Reactive Airways Dysfunction Syndrome (RADS) was the only pre-defined diagnostic option available for a Nations client alleging a respiratory condition. *See* Plaintiff Forms. Yet, neither Dr. Hoover nor Dr. Martin could accurately define this severe acute respiratory condition that resembles a

were designed for the sole purpose of manufacturing conditions for compensation under the SPC Matrix.

By way of example, besides "Normal" and "Other," the only diagnostic options available on the pre-typed Nations Syndicate Forms were:[20]

- for the Ocular Page - "Chronic Damage to" either the Conjunctiva, Cornea, or Surrounding Structures



- for the Sinus Page - only "Chronic Rhinosinusitis":



- for the Dermatologic Page - "Chronic Contact Dermatitis at the Site of Contact" or "Chronic Eczematous Reaction at the Site of Contact":



- for the Respiratory Page - only "Reactive Airways Dysfunction Syndrome":



respiratory burn requiring immediate medical attention; and, instead, confused and conflated the syndrome with a separate condition - Reactive Airways Disorder (RAD), a generic umbrella term for a variety of breathing problems. *See* Exhibit F, Deposition of Rick D. Hoover, D.O., *Lamarice Riley v. BP Exploration & Prod. Inc., et al.*, Case 1:19cv00061-HSO-JCG (September 30, 2019) ("Hoover Dep.") at 113:17-114:1; Martin Dep. 19:23-20:9. Moreover, instead of requiring a positive methacholine challenge test (the crucial prerequisite to establishing a RADS diagnosis), Nations had the syndicate doctors rely upon easily manipulated pulmonary function tests using testing equipment supplied by the lawyers as the "data" to support that "diagnosis." *See* Martin 29:2-31:3, 69:20-24; Hoover Dep. at 103:14-114:1. Even if a PFT was the appropriate diagnostic tool for RADS (which it is not), the Nations Syndicate still failed to meet even that criteria. As Hoover acknowledged, in any instance where the ATS reproducibility requirement is not met, the test results would be unreliable and they would have to withdraw their RADS diagnoses. *See* Hoover Dep. at 110:18-23, 112:20-113:16; Martin Dep. at 63:16-65:23, 66:20-69:1, 76:15-19. None of the RADS "diagnoses" purportedly signed by the two doctors are supported by PFTs that meet ATS reproducibility standards (*see* Plaintiff Forms); therefore, those RADS "diagnoses" are now effectively withdrawn.

[20] *See* Exemplar Forms at 2-7, 10-15; *see generally* Plaintiff Forms.

The logical effect of limiting the pre-defined diagnostic options to those above is that Nations Syndicate doctors are encouraged to shoehorn what should be a very plaintiff-specific evaluation and analysis into the limited set of conditions for which Nations believed it could receive the highest fee under the SPC matrix. *See* MSA at § VI and Exhibit 8 thereto. By way of example, the number of "diagnoses" of each pre-defined condition among the Exhibit A Plaintiffs is as follows:

| Nations Syndicate Doctor | Total Exhibit A Plaintiffs "Diagnosed" out of 236 | No. of Pre-Defined "Diagnoses" Among the Exhibit A Plaintiffs | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Ocular - Chronic Damage to: | | | Sinus | Dermatologic - Chronic: | | Respiratory |
| | | Conjunctiva | Cornea | Surrounding Structures | Chronic RhinoSinusitis | Contact Dermatitis | Eczematous Reaction | RADS |
| Hoover | 136 | 125 | 30 | 125 | 128 | 8 | 122 | 100 |
| Martin | 100 | 86 | 3 | 15 | 86 | 70 | 17 | 57 |

*See* Plaintiff Forms (reflecting most Plaintiffs receiving more than one pre-defined "diagnosis").

## 2. The Nations Syndicate Forms Falsely Purport to Contain *Overall* Medical Histories Constructed by Nurse Practitioners.

Unlike legitimate medical evaluations, where the *proper, accurate, and timely recording* of patient information (such as current medications, full medical history, social history, work/exposure history, history of present illness, and review of symptoms/chief complaints) is crucial to prevent errors in the interpretation of test results and in performing differential diagnoses, the information relied upon by the Nations Syndicate doctors, including Drs. Hoover and Martin, was wholly the creation of the lawyers and their employees.[21] Not one document reflecting a diagnosis, treatment, or clinic visit from any of the actual treating physicians for these Plaintiffs was provided to them.[22] And yet, even that troublesome fact fails to adequately convey the extent of the unreliable data underlying the Nations Syndicate "diagnoses."

---

[21] *See* Hoover Dep. at 77:16-79:7, 83:23-84:2; Martin Dep. at 55:6-14.

[22] *See* Hoover Dep. at 83:19-22; Martin Dep. at 37:19-21. Neither Martin nor Hoover would verify all of the information provided by the Nations employees on the forms. Noting that he found errors and omissions in their summaries, Martin would (at least) briefly "talk to" the Nations clients about some of the information provided.

12

According to the Signature Page of every set of Nations Syndicate Forms, the medical histories contained therein were allegedly drafted by one of two nurse practitioners in California, either Wendy Brunet or Eva Hvingelby.[23] Employed by the Nations Syndicate, and not by any of the syndicate doctors, these nurses purportedly "assisted" thousands[24] of Nations Plaintiffs across multiple states in "constructing" their overall medical histories based on "chief complaints," "history of present illness," and "past medical history" that were supposedly "verified to be true and correct":

> I am a Certified Nurse Practitioner and I have assisted the patient in constructing his medical history based upon the chief complaints, history of present illness, and past medical history that the patient has verified to be true and correct.
>
> *Wendy Brunet, NP-C*
>
> _____
> Wendy  Brunet NP-C
> 1401 Willow Pass Rd Ste 890
> Concord CA 94520

*These statements, however, are false.* According to their sworn deposition testimony, Brunet and Hvingelby never met or spoke to any of the Nations clients, and never reviewed a single medical record related to any Nations clients.[25] They were simply hired "to do data entry" into a pre-approved "medical format" at a rate of $20 per Plaintiff.[26] Following a specific protocol established by the lawyers, the nurses were told that "case managers in the field" would "gather the subjective information from each of the plaintiffs" relating to their work, exposure,

---

Martin Dep. at 54:2-11. Hoover, on the other hand, did not review the medical histories or summary of chief complaints with Nations clients at all - choosing to take them at face value given the limited purpose of his evaluations. Hoover Dep. at 88:22-89:8. As Hoover noted, given the time limitations with each Nations client and the absence of any corroborating or additional materials, they did not (and could not) have independently verified the truth and accuracy of the limited data on which they were required to rely. Hoover Dep. at 125:2-13.

[23] *See generally* Plaintiff Forms. To be clear, neither Dr. Hoover nor Dr. Martin has ever met these two nurse practitioners. *See* Hoover Dep. at 57:23-25; Martin Dep. at 40:20-41:24. They do not know the nurses' qualifications; did not provide the nurses with any guidance as to the manner in which the medical histories were to be obtained; and, did not instruct the nurses on what information was essential to have for their evaluations. *Id.*

[24] *See* Exhibit G, Deposition of Eva Hvingelby, *Katrina Kreeger v. BP Exploration & Prod. Inc., et al.*, Case 1:19cv0077-LG-RHW (December 17, 2019) ("Hvingelby Dep.") at 19:15-20; Exhibit H, Deposition of Wendy Brunet, *Katrina Kreeger v. BP Exploration & Prod. Inc., et al.*, Case 1:19cv0077-LG-RHW (December 17, 2019) ("Brunet Dep.") at 72:9-21. Out of the 236 BELO Plaintiffs on Exhibit A, Hvingelby appears as the nurse associated with 159 BELO Plaintiffs, and Brunet with the remaining 77. *See* Plaintiff Forms.

[25] *See* Hvingelby Dep. at 15:11-24, 16:1-11, 18:1-3; Brunet Dep. at 14:5-20, 22:8-14, 42:1-7, 64:23-65:2.

[26] *See* Brunet Dep. at 17:25-18:3, 18:13-19:1, 66:11-66:21; Hvingelby Dep. at 24:24-25:2, 15:4-7.

and medical histories.[27]  Unknown individuals would then enter some version of that information into the Nations "database"; and, Brunet and Hvingelby were to pull *whatever information was contained in the Nations database* and enter it into the template medical format.[28]  In other words, NONE of the pre-printed information on the forms came directly from the plaintiffs; instead, it was sourced from databases created and maintained by the Nations Syndicate. Furthermore, neither of the nurses knew what would happen to their work after they "hit send."[29] They kept no record of their writings, never saw the final product, and have no way of knowing if the summary of the Nations database they created was altered or amended in any way.[30]  Nor do they know how or when their electronic or stamp "signatures" were added to these documents - as *they never saw a final set of Nations Syndicate Forms until the day before their depositions when "samples" were provided to them by Nations.*[31]

The significance of this process and protocol cannot be overstated.  *"Everything"* that was pre-typed on the Nations Syndicate Forms (dates, work history, history of present illness, and chief complaints), and thus everything on which Drs. Hoover and Martin relied, "was taken directly from what was provided" in the Nations database, without any independent verification.[32]  Moreover, the California nurses were instructed that any "kind of questions, or inconsistencies, [or] lack of information" in the data would be resolved *by Nations.*[33]  **As one Nations Syndicate lawyer instructed: "I do not want you bogged down by inconsistencies.  I will correct it.  I just want you guys cranking.  It will get better.**"[34]

---

[27] *See* Brunet Dep. at 20:24-21:11, 22:21-23:24; Hvingelby Dep. at 16:12-17:5.
[28] *See* Hvingelby Dep. at 15:4-7, 17:11-25; Brunet Dep. at 20:24-21:11, 23:4-25:21, 27:13-15, 50:6-13.
[29] *See* Brunet Dep. at 25:22-26:1; Hvingelby Dep. at 18:4-9.
[30] *See* Hvingelby Dep. at 20:7-25, 34:12-35:2, 41:2-6; Brunet Dep. at 31:18-32:19, 75:19-21, 88:15-18.
[31] *See* Hvingelby Dep. at 18:4-20:6, 25:3-10; 30:11-15; Brunet Dep. at 25:22-26:1, 30:12-31:17, 75:19-21, 82:12-18.
[32] *See* Brunet Dep. at 79:17-21 (emphasis added).
[33] *See* Brunet Dep. at 21:20-25.
[34] Brunet Dep. at 60:4-6 (emphasis added).

3. **The Nations Syndicate Forms Contain Medical Histories and Data That Are Inaccurate, Misleading, and Unreliable.**

The underlying data and "medical histories" in the Nations Syndicate Forms are inherently inaccurate, incomplete, and misleading information too deficient and unreliable to support a BELO diagnosis.

**(a) Medical Information Essential for Rendering Differential Diagnoses Was Never Collected by the Nations Employees or Provided to Nations Syndicate Doctors.**

Even a layperson can recognize the importance of an accurate smoking history when evaluating a patient for possible respiratory problems. Yet, there is *not one mention of smoking or cigarette use in any of the medical histories* Nations provided to the doctors.[35] Similarly, the histories constructed by Nations with respect to ocular, sinus, and dermatological conditions fail to address a host of other relevant medical information on a nearly universal scale. *See* Plaintiff Forms. Does the plaintiff have allergies? Is the plaintiff taking any medications with relevant side effects? Does the plaintiff have a history of addiction or drug abuse? Did the plaintiff recently switch household product brands? Does the plaintiff have a relevant pre-existing chronic condition? Is there any other litigation in which the plaintiff is involved wherein they are alleging a different set of injuries and illnesses? Does the plaintiff work in front of a monitor or screen? Does the plaintiff have a mental health history affecting recall and reliability?

The list of relevant, yet entirely absent, information is extensive.[36] When asked about these deficiencies at deposition, Dr. Martin openly criticized the quality and sufficiency of the "facts" on which the syndicate doctors were required to rely, stating:

> "I just don't think [these are] comprehensive evaluation[s]." Martin Dep. at 71:12-15. "It is not really consistent with . . . our general history and physical examination that we do in the clinic. This is . . . generated by somebody else for different . . . purposes." *Id.* at 55:8-14.

---

[35] *See* Plaintiff Forms; Martin Dep. at 70:24-71:18; Hvingelby Dep. at 42:7-24; Brunet Dep. at 72:5-73:14.
[36] *See Id.*; Hoover Dep. at 123:12-127:12; 133:21-134:11; Brunet Dep. at 83:17-84:19, 93:1-14; 97:13-98:1; Hvingelby Dep. at 42:7-43:16.

Dr. Martin is correct. The medical histories ostensibly gathered by unknown Nations employees at unknown times and edited by unknown individuals fall far short of the standards generally accepted in the medical community.[37]

The medical history for Plaintiff Lamarice Riley, the case in which Dr. Hoover's deposition was recently taken, is illustrative of the misleading nature of the "facts" provided to Nations syndicate doctors. Consider the "History of Present Illness" and "Chief Complaint" sections of Riley's Respiratory Page. S*ee* Exemplar Forms at 13.

> **Chief Complaints:** Patient currently complains of Cough, Sputum Production, Wheezing, Chest Tightness and Shortness Of Breath.
>
> **History of Present Illness:** Patient is a 23 year old male. On or about 5/15/2010 he reported strong fumes were inhaled that smelled like burnt oil while engaged in cleanup duties. Beginning within 24 hours of exposure, shortness of breath developed. Chronic and ongoing complaints following inhalation of the fumes are Cough, Sputum Production, Wheezing, Chest Tightness and Shortness Of Breath. There is no history of pre-existing pulmonary disease prior to the exposure date.

Riley, as with all of the 236 Plaintiffs subject to the instant motion, was allegedly evaluated nearly four years after his spill response work. *See Id.*; *see also* Plaintiff Forms. Yet, upon review of the information provided by Nations, one would assume he is "currently" complaining of "cough," "shortness of breath," and a host of other symptoms which he attributes to his work from four years earlier. S*ee* Exemplar Forms at 13. Additionally, Riley's forms contain an inaccurate claim of "no history of pre-existing pulmonary disease prior to exposure date." *Id.* Yet, absent is any mention of Riley's pre-existing diagnoses that actually could affect some of the same systems and symptoms he purportedly complains of here. *See* Hoover Dep. at 123:22-124:19. For example, the medical history collectively gathered and reported by unknown Nations Syndicate employees fails to mention his: bipolar disorder; schizoaffective disorder; major depressive disorder; PTSD; delusional disorder; and, history of abusing cocaine, heroin,

---

[37] Moreover, since all of the information provided to syndicate doctors funneled through Nations, similarities among the description of symptoms and language used further call into question the legitimacy of the data. *See e.g.* Hoover Dep. at 125:14-20; Plaintiff Forms.

opioids, PCPs, and amphetamines - conditions which can affect respiratory and sinus systems as well as a person's ability to accurately report on their own health status. *Id.*

Nurse Brunet, however, seemed un-phased by this significant diagnostic flaw in the Nations Syndicate process. As she put it, their job was "just to expedite" and "make it simple" for the syndicate doctors. *See* Brunet Dep. at 94:14-95:6. "And, if they had any further questions regarding asthma, allergy, drugs, delusions, that's on them." *Id.* Quite the contrast to Dr. Hoover's very specific belief that *the nurses* had pre-screened every Nations client he evaluated for relevant pre-existing conditions.[38]

**(b) The Nations Syndicate Forms, and the Purported Findings Contained Therein, Falsely Imply that All Symptoms, Complaints, and Conditions Were Present on Physical Exam.**

In a recent December 5, 2019 decision,[39] the Honorable Susie Morgan of the United States District Court for the Eastern District of Louisiana excluded, *inter alia*, a set of Nations Syndicate Forms under Rule 702 because it was not clear "how, *when*, or by whom" the underlying information was gathered. Thus, while Riley is illustrative of the insufficiency of information provided by Nations, lack of a complete and accurate medical history is not the only problem with the data and medical information upon which the Nations Syndicate doctors relied. Reinforcing the concerns expressed by Judge Morgan, Brunet and Hvingelby recently testified that they do not know when, where, how, or by whom the information about the Nations clients was *collected or entered* into the Nations database.[40] While they believe Nations "case

---

[38] *See* Hoover Dep. at 57:15-25, 83:23-84:2, 125:14-23.
[39] *See* Order and Reasons, *Benjamin James Williams v. BP Explor. & Prod. Inc., et al.*, Rec. Doc. 73, Case 2:18-cv-09753 (E.D. La. December 5, 2019) ("Williams Order") at 13 (criticizing and finding unreliable the information provided by Nations employees on the Nations Diagnostic forms). In discussing her exclusion of a set of Nations Syndicate Forms under Rule 702, Judge Morgan found that the forms failed to contain detailed information regarding: (1) the timing/duration of tasks performed during the BP recovery effort; (2) the work the Nations clients did before or after their time spent on the BP recovery effort; (3) the length of time over which the Nations clients experienced symptoms; and, (4) the identity, concentration, frequency of exposure, or duration of exposure to any particular chemical or substance. *See* Williams Order at 13-16.
[40] *See* Brunet Dep. at 22:21-24:5, 25:17-21, 27:9-15, 96:17-97:8; Hvingelby Dep. at 17:6-25.

managers" must have collected it (and unnamed individuals must have entered it) sometime in the years "after the spill and before it came to [them]," Brunet and Hvingelby never saw the forms the case managers were using, and never provided the case managers with any guidance, training, or supervision.[41]   Nevertheless, the nurses relied wholly on the information in the Nations database to write their "chief complaints" and "history of *present* illness" summaries, which were purportedly incorporated into thousands of Nations Syndicate Forms on which syndicate doctors, like Drs. Martin and Hoover, relied.[42]

The vague timing behind the collection and reporting of the alleged symptoms, complaints, and present illnesses of Nations clients is significant.  When presented as designed, the Nations Syndicate Forms lead the reader to assume that *at the time of their evaluation*, each Plaintiff was suffering from the signs and symptoms (circled "findings" on physical exam) and illnesses/conditions (circled "diagnostic" opinions) identified therein.   Yet, that assumption is *categorically incorrect.*  As Drs. Hoover and Martin explained, ***they were instructed to circle signs and symptoms on the forms whether they were actually present on physical exam or not.***[43]  If a Nations client, for example, had a perfectly normal dermatologic physical exam, but reported that a year ago he had a large rash on his right arm, then the doctors were instructed by Nations to indicate "Abnormal Exam" on the Dermatologic Page and mark the right arm of the drawing (as if the symptom was present that day).   *See* fn. 43 *supra*.  The same was true, for example, for reports of shortness of breath (respiratory), red eyes (ocular), drainage (sinus), and any other signs or symptoms reported by the Nations clients.  *Id.*  Put simply, in order to get the syndicate doctors to circle a "positive" finding for one of the symptoms identified on the Nations

---

[41] *See* Brunet Dep. at 23:4-17, 36:22-23; Hvingelby Dep. at 16:12-17:5.
[42] *See* Plaintiff Forms; Brunet Dep. at 27:22-24, 28:17-20; Hvingelby Dep. at 17:20-25, 21:21-23.
[43] *See* Martin Dep. at 43:5-44:9, 45:1-4, 49:20-25; Hoover Dep. at 94:9-19, 105:23-106:21, 114:9-116:21.

Syndicate Forms, all the Nations client needed to do was tell the doctor they suffered from that symptom at some point in time in the past.  *Id.*

As a result, **both Drs. Hoover and Martin admitted that in looking at the "findings on physical exam" circled in the Nations Syndicate Forms, there would be no way of knowing which symptoms were circled because they were actually present on physical exam verses which symptoms were circled because Nations clients claimed to have had them historically**.  *Id.*  The significance of this point cannot be overstated as: (1) it renders these "findings" unreliable, at best, for use by Drs. Hoover, Martin, or any future reviewing clinician; and (2) it means the already flimsy "criteria" for diagnosing Nations clients could always be met - even in cases where the plaintiff was perfectly normal on physical exam.

### (c) The Nations Syndicate Nurses Believed their "Signature Statements" Referecing "Past Medical History" Were Misleading and Asked to Have Them Changed. They Were Not.

Cognizant of the inherent limitations in relying on unidentified, untrained Nations Syndicate "case managers" and troubled by the fact that the "signature statement" on the Nations Syndicate Forms implied a complete medical history had been provided, Brunet and Hvingelby expressed concerns to Nations that the language used on the forms to describe their work was misleading and *did not accurately reflect what they were actually doing* "in this role".  *See* Hvingelby Dep. at 28:20-29:22.   In an email to the lawyers, Hvingelby wrote:

> "We have revised the signature statement for our H&Ps to more accurately reflect our role.  ***We also removed the wording 'past medical history' since this implies the overall medical history which we are not including***.  Please change our current signature line to this updated language."

*Id.*  Both nurses believed their request to remove the inaccurate reference to "past medical history" in the form signature statement had been granted.[44]   Shockingly, it was

---

[44] *See* Hvingelby Dep. at 28:20-29:22; *see also* Brunet Dep. at 46:17-47:18.

not until their depositions on December 17, 2019, that Brunet and Hvingelby discovered

it had not.[45]

### 4. Every Nations Syndicate Form Contained a Pre-Typed Causation Opinion Presciently Finding that Any and All Conditions "Diagnosed" by Nations Syndicate Doctors, Including Drs. Hoover and Martin, Were Caused by Exposures From Clean-Up Work.

Nations did not limit their control and influence over the content of the Nations Syndicate

Forms to the diagnostic options and medical histories alone.  Nations also dictated the ultimate

outcome of ***the doctors' opinions as to what caused the alleged conditions they would***

***purportedly diagnose***.   Each Nations Syndicate Form contained the following pre-printed

causation statement directly above the signature line for the doctor: "Further, based on the

patient's attested history and my physical examination of the patient, I find it to be more likely

than not that this diagnosis is causally related to the patient's direct exposure to chemicals during

BP clean-up work." [46]



When asked if Nations ever gave them the option to say that any of their "diagnoses" were ***not***

***related*** to the spill, Dr. Hoover replied "Never."   *See* Hoover Dep. at 91:5-10.  Consistent with

the doctor's testimony, there is ***no option*** on the Nations Syndicate Forms for the doctors to find

that a "diagnosis" is ***not related*** to work on the spill response effort. [47]

The pre-printed forms created by Nations included these medical causation statements

despite the fact that both Drs. Hoover and Martin readily admitted at deposition that they would

---

[45] *See Id.*; Hvingelby Dep. at 31:14-22.
[46] *See* Plaintiff Forms; Exemplar Forms at 2-3, 5, 7, 10-11, 13, 15; Hoover Dep. at 90:10-21; Martin Dep. at 50:1-10.
[47] *See* Hoover Dep. at 91:5-10, 101:8-16; *see generally* Plaintiff Forms.

not be qualified to render an expert opinion on causation in federal court.[48] Among the factors precluding them from potentially evaluating the issue of causation was their complete lack of knowledge with respect to: (1) the identity of the chemicals to which the Nations clients allege exposure; (2) the nature of those materials (toxicity); (3) the level and duration (or dose) of any purported exposure; (4) the timing of exposure; (5) whether there has been any association in peer-reviewed medical and scientific literature between the conditions and exposure; and/or, (6) the health status of the Nations client at the time of exposure.[49]

Drs. Hoover and Martin simply agreed to sign forms containing pre-printed causation statements based on nothing more than Nations' *post hoc ergo propter hoc* representations that none of the clients had any relevant pre-existing symptoms or illnesses prior to the spill.[50] Neither Dr. Hoover nor Dr. Martin ever performed any research or analysis with respect to the causation of any of the symptoms, illnesses, injuries, or diseases the Nations clients alleged.[51] Yet, Nations still included the unsupported, inadmissible pre-typed causation finding on every Nations Syndicate Form.

### C. Attorney-Controlled and Funded Diagnostic Schemes, Like the Nations Syndicate, Attempt to Protect the Doctors they Employ by Ensuring No Physician-Patient Relationship Exists with Plaintiffs.

It is clear that Drs. Hoover and Martin are not treating physicians, but rather retained "experts" who were hired by Nations for the sole purpose of generating claims against BP. In fact, Nations Syndicate Forms included an express acknowledgement that no physician-patient relationship existed between the Nations Syndicate doctors and their clients. Specifically, each

---

[48] *See* Hoover Dep. at 132:6-10, 130:13-18; Martin Dep. at 53:22-25, 72:7-9.
[49] *See* Hoover Dep. at 127:13-129:19; Martin Dep. at 51:13-52:15.
[50] *See* Hoover Dep. at 131:17-132:10; Martin Dep. at 52:12-24. This is especially troublesome given the recent revelations that: (a) unidentified Nations "case managers" were responsible for collecting medical information and allegedly "pre-screening" Plaintiffs, and (b) information vital to rendering differential diagnoses was never provided to the physicians. *See* discussion *supra* Section II.B.2-3.c; Hvingelby Dep. at 21:11-14; Brunet Dep. at 86:18-22.
[51] *See* Martin Dep. at 77:11-17; Hoover Dep. at 90:22-91:12.

client agreed that: "This examination ***does not create a formal patient-doctor relationship and shall not bind this physician or qualified medical provider in any way to provide continuity of care or ongoing treatment***."  *See* Exemplar Forms at 16.



This document is an Independent Medical Examination.  The purpose of the examination and review of medical history is to determine whether this former BP Oil Spill Clean- Up Worker suffers from one or more Specified Chronic Physical Conditions or a qualifying Acute Condition listed within the Specified Physical Condition Matrix of the BP Medical Benefits Settlement Class Action.

This examination does not create a formal patient-doctor relationship and shall not bind this physician or qualified medical provider in any way to provide continuity of care or ongoing treatment.

Patient's Signature | Lamarice Dimitri Riley Jr — Patient Printed Name | Date 5/23/14

Each of the 236 Plaintiffs subject to this motion signed this "lack of physician patient relationship" acknowledgment.  *See* Plaintiff Forms.  Drs. Hoover and Martin also affirmed the limited nature of their relationship with the Nations clients when explaining *their complete lack of records and knowledge regarding these individuals in response to subpoenas*:

> "I was retained by The Nations Law Firm to evaluate claimants and provide reports for their use in asserting claims against BP.  I do not have a physician-patient relationship with The Nations Law Firm clients I evaluated.  As such, I do not (and did not) maintain The Nations Law Firm client records with the files of my regular medical practice.  I did not maintain originals or copies of any reports, or amendments thereto, that I may have authored relating to the claimants identified in the subpoena or any other clients of The Nations Law Firm for whom I performed this evaluation work.
> . . .
> Therefore, I do not have any documents, materials, or information responsive to these requests made in the subpoena attached hereto . . ."[52]

Thus, absent a physician patient relationship and restricted by their agreement with Nations (and the process/results it required), these doctors were effectively hired guns operating at the sole direction and behest of the lawyers - leading to two very important consequences.

---

[52] *See* Exhibit I, Rick Hoover, D.O., Affidavit of No Records in Response to Subpoena (August 6, 2019) at 1 ("Hoover No Records Affidavit"); Exhibit J, James B. Martin, M.D., Affidavit of No Records in Response to Subpoena (August 7, 2019) at 1 ("Martin No Records Affidavit").  As Dr. Hoover succinctly testified at deposition with respect to the Nations clients: he was not their treating physician, he did not prescribe any medications, he did not provide any treatment, and he did not order any diagnostic tests.  Hoover Dep. at 11:13-16, 117:10-19; *see also* Martin Dep. at 9:18-10:16, 39:7-40:3.

First, the Nations Syndicate Forms do not constitute medical records, but rather expert[53] reports under the Federal Rules of Evidence. Second, as they candidly admitted, Drs. Hoover and Martin did not apply the same standards and methodology to the Nations Syndicate work that they use with actual patients in their own medical practices.[54] Instead, *every aspect of their work with the Nations Syndicate was tailored to the needs of the lawyers the law firm paying the bill.*

### III. THE OPINION TESTIMONY OF DRS. HOOVER AND MARTIN, INCLUDING THAT IN THE FORM OF PURPORTED FINDINGS AND DIAGNOSES IN THE UNAUTHENTICATED NATIONS SYNDICATE FORMS, IS UNRELIABLE AND INADMISSIBLE.

The Nations Syndicate scheme was established to purchase diagnoses to support SPC claims processed administratively by a third-party claims facility. As a result, the protocols put in place by the Nations Syndicate ultimately lead to one unavoidable result: the opinion testimony of the Nations Syndicate Doctors (like Drs. Hoover and Martin), including that in the form of the purported findings and diagnoses contained in the unauthenticated Nations Syndicate Forms, cannot withstand the evidentiary rigors of federal court. They are wholly unreliable and inadmissible under the Federal Rules of Evidence.

### A. The Nations Syndicate Doctors Do Not Know Who They Evaluated or What Conditions They Diagnosed.

The Nations Syndicate scheme functioned in the same basic manner for each of the 236 Plaintiffs subject to this motion. Nations representatives would call the office of either Dr.

---

[53] The term "expert" is used loosely here as both Drs. Hoover and Martin concede that they would not qualify as experts in federal court on the issues in BELO cases. *See* Hoover Dep. at 23:10-25:1; 69:19-21; Martin Dep. at 12:5-8; 23:14-24:20; 68:22-69:1. Historically, Nations has attempted to evade the reporting requirements of Fed. R. Civ. Proc. Rule 26(a)(2)(B) when disclosing a Nations Syndicate doctor as the expert who will testify regarding a plaintiff's medical diagnosis. Nations will list the doctor under a mistitled "Treaters" section of their expert witness disclosure and falsely claim they were "unretained." However, federal courts in Louisiana have recently addressed this issue, finding (not surprisingly) that: (1) Nations Syndicate doctors are in fact "retained" experts and not treating physicians; (2) they are required to submit fully compliant reports under Rule 26; and, (3) the content of the Nations Syndicate forms does not meet the requirements of a proper Rule 26 disclosure. *See Benjamin James Williams v. BP Explor. & Prod. Inc., et al.*, Rec. Doc. 35, Case 2:18-cv-09753 (E.D. La. November 6, 2019) at 1.

[54] *See* Hoover Dep. at 70:10-15, 88:2-89:8, 89:20-90:3, 92:9-16, 125:2-13; Martin Dep. at 55:6-14, 70:24-71:18; *see also* discussion *infra* Section III; discussion *supra* Section II.B.1-4.

Hoover or Dr. Martin to report they had a group of clients who needed an SPC diagnosis and to ask if the doctor had room in his schedule to see them.[55] Dr. Hoover estimated Nations escorted 400 clients to his office over a six month period (at a maximum rate of 20-30 in one day).[56] Dr. Martin opined it could have been as many as 320 (at a maximum rate of 30 in one day).[57]

Of course, the doctors are only able to provide estimates of the number of Nations clients they screened because: (1) they do not know who they actually evaluated; (2) they did not maintain a list of the Nations clients escorted to their clinics; (3) they did not verify a single person's identity before evaluation; (4) they did not require Nations clients to complete their practice's standard intake, medical history, and authorization forms; and, (5) they intentionally, by agreement with Nations, did not retain an original or copy of any document, report, note, form, test, or any other writing evidencing their findings or the results of their evaluations.[58] In fact, when subpoenaed for records relating to their work in the Nations Syndicate, both Drs. Hoover and Martin confirmed through no-records affidavits provided in response to their subpoenas that their offices had *nothing* (not one document) responsive to the Defendants' requests.[59] They each further attested that: "[i]f provided with an alleged original (or copy) of a report issued for a Nations Law Firm client and purportedly authored by me, I am unable to swear under oath that the content and substance of that report are accurate, complete, and have not been altered or amended in any way." *Id.*

Moreover, as Dr. Hoover confirmed at his deposition, the doctors have no way of knowing if a Nations Syndicate Form has been manipulated following their evaluation, or even completely faked:

---

[55] *See* Hoover Dep. at 65:7-25; Martin Dep. at 32:10-33:16.
[56] *See* Hoover Dep. at 66:8-67:3, 70:3-9, 121:13-23.
[57] *See* Martin Dep. at 33:24-34:7, 35:12-14.
[58] *See* Hoover Dep. at 11:17-13:9, 39:1-25, 41:2-9, 68:8-11, 120:17-121:6; Martin Dep. at 10:5-11:17, 21:1-16, 36:20-24, 42:18-43:4.
[59] *See* Hoover No Records Affidavit at 1; Martin No Records Affidavit at 1.

"Because like I said, we didn't write any of this down, we didn't copy any of this, nothing." . . ."[W]e were told we didn't have to store them. We didn't store them. We never had them."[60]

Paper invoices were avoided as Nations pre-paid the doctors based on the number of diagnostic pages they would rubber-stamp: "you didn't have to invoice them," because the lawyers "knew how many people were coming in and what was going to get looked at, and so they would just have a check."[61]

Thus, as a result of the process implemented by Nations, neither Dr. Hoover nor Dr. Martin knows who they evaluated or what their findings were; and, they are unable to authenticate any of the Nations Syndicate Forms they may have signed or the findings and opinions they contain.[62]

### B. Drs. Hoover and Martin Failed to Follow Medically-Established Methodologies When Performing Their Work for the Nations Syndicate.

The rigid and contrived structure of the Nations Syndicate Forms illustrates the corresponding flaws in methodology that render the findings and diagnostic opinions they contained inadmissible. ***Nations not only supplied inadequate medical histories for their clients, they also dictated the conditions to diagnose, what physical exams to perform, what symptoms to note (regardless of whether or not they were present on physical exam), what clinical tests to conduct, what equipment to use, and what diagnostic criteria to apply (if any).*** Thus, the Nations Syndicate doctors, like Drs. Hoover and Martin, failed to follow the scientifically established methodologies for rendering a differential diagnosis of *any* of the pre-selected conditions on the Nations Syndicate Forms. As further evidence of their inadequacies in

---

[60] *See* Hoover Dep. at 12:13-13:9, 90:2-3, 121:3-5
[61] *See* Hoover Dep. at 64:17-23; Martin Dep. at 34:18-35:11.
[62] Beyond the inability to authenticate, questions persist as to whether forms attributed to Drs. Hoover and Martin were manipulated (or even completely faked) due to odd appearing signatures, changes to diagnosis dates, and changes to findings. *See e.g.* Brunet Dep. at 80:6-82:11, Exhibit 15-16 (discussing the manipulation of two reports purportedly signed by Dr. Martin); Plaintiff Forms (evidencing altered/missing diagnosis dates, odd signatures, changes to findings/diagnoses, PFT manipulation, etc.); Hoover Dep. at 89:9-19; 134:12-20.

these areas, one needs to look no further than either: (1) their inability to set forth even one scientifically-based diagnostic criteria they utilized; or, (2) their testimony effectively disavowing their alleged diagnoses.

### 1. Drs. Hoover and Martin Concede that the Medical Histories and Data in the Nations Syndicate Forms are Insufficient and Unreliable.

Neither Dr. Hoover nor Dr. Martin can attest to the accuracy of the information upon which they relied or the methodology - if any - utilized by Nations employees in gathering, collecting, entering, and summarizing the data.[63] As Dr. Martin testified at his deposition:

> "I did not generate this form. It's really a pretty poor form, in the first place. It is not really consistent with . . . our general history and physical information we do in the clinic. This is generated by someone else for different purposes and I did the best I could with the forms."

Martin Dep. at 55:7-14; *see also* discussion *supra* Section II.B.2-3.c. The syndicate doctors and nurses concede that overall, past medical histories and information essential to accurate, differential diagnoses were missing from the materials provided to Drs. Hoover and Martin as well. *See* discussion *supra* Sections II.B.2-4. Because control over the medical histories was ceded to Nations, the underlying facts and data upon which they relied amounted to nothing more than unsupported, un-verified, and biased summaries that resulted in a 100% positive diagnosis rate for the Nations clients. *See Id.;* Hoover Dep. at 119:12-16.

### 2. Drs. Hoover and Martin Admitted They Did Not Utilize Any Medically-Based Diagnostic Criteria in Their Work with the Nations Syndicate.

Drs. Hoover and Martin are unable to articulate any medically-based diagnostic criteria they utilized in their work with the Nations Syndicate. A review of their collective testimony ultimately leads to the conclusion that the diagnostic criteria they employed, if any, did not go

---

[63] *See* discussion *supra* Sections II.B.2-3.c.

beyond the Nations Syndicate Form itself.[64]  Regardless of the system or symptom being evaluated, the only consistent criteria Drs. Hoover and Martin applied was that if they were able to circle one or more of the pre-defined symptoms on the Nations Syndicate Forms, then they were not only justified in circling one of the pre-defined diagnostic options provided by Nations, but required to do so.[65]  This "methodology" is particularly troublesome given that the Nations clients did not need to actually present with a symptom on physical exam in order to have a "positive" physical exam finding.[66]  Rather, in order to have it circled, a Nations client need only report to the doctor that they believed they *previously* had one or more of the pre-defined symptoms or physical findings.  Put simply, the diagnostic criteria generally-accepted in the medical community was irrelevant to their work signing forms for the Nations Syndicate in support of BP claims.

Unable to even explain[67] some of the conditions they purportedly diagnosed and faced with the realization that their work for the Nations Syndicate would be subject to scrutiny in federal court, Dr. Martin disavowed all of his purported "diagnoses" when he testified as follows:[68]

> **A. Look, there's criteria for everything.  All of these organizations have criteria.  I'm not specifically familiar with all their criteria.  And . . . this examination that we did on these people is not - - doesn't - - is not that all-encompassing.  This is a - - I think a screening test, screening thing only.**
> **. . .**
> **And when you talk about diagnoses and that sort of thing, I'm not sure that . . . you can refer to these things as diagnoses.**
>
> **Q. [W]ould it be fair to say that you would not consider the findings on any of the forms for any of the Nations clients to be formal diagnoses?**
>
> **A. Correct.**

---

[64] *See e.g.* Hoover Dep. at 115:5-116:21, 84:3-88:21, 94:25-97:12, 126:12-22; Martin Dep. 46:21-47:21, 73:2-74:17.
[65] *See Id;* discussion *supra* Section II.B.1-3.c.
[66] *See Id.*
[67] *See* fns. 19, 53-54 *supra.*
[68] Martin Dep. at 74:23-75:14, 76:15-19.

## IV. ARGUMENT

### A. Plaintiffs Are Unable To Establish Through Admissible Evidence the "Fact Of Diagnosis" of their LMPCs.

BELO lawsuits are a product of the MSA and the exclusive remedy against BP for Class Members who claim to have developed an exposure-related physical condition first diagnosed after April 16, 2012, or LMPC. *See* MSA § II.VV. To satisfy the elements of a BELO claim, Plaintiffs must prove, *inter alia*: (1) the fact of diagnosis - that they were correctly diagnosed with their alleged LMPC, and (2) that their condition was legally caused by their exposure to substances released as a result of the *Deepwater Horizon* incident.[69] Moreover, a BELO Plaintiff "must rely on expert testimony to prove his medical diagnosis and causation."[70]

The 236 Plaintiffs subject to the instant motion brought their BELO lawsuits pursuant to the contractual terms of the MSA. Accordingly, Plaintiffs must prove, based on admissible evidence from a medical expert, that they were in fact correctly diagnosed with each LMPC they allege. Here, as part of their initial disclosure obligations in the MDL,[71] Plaintiffs identified Drs. Hoover and Martin as the physicians who first diagnosed their LMPCs and proffered Nations Syndicate Forms as the "proof" of same. *See* Plaintiff Forms. Yet, as demonstrated herein, the findings and diagnostic opinions contained in the unauthenticated syndicate forms are unreliable and inadmissible.

---

[69] *See* Williams Order at 22; *Banegas v. BP Explor. & Prod. Inc.*, Civil Action. 17-7429, 2019 WL 424683 at *2 (E.D. La. Feb. 4, 2019) ("Banegas Order") (citing *Piacun v. BP Expl. & Prod., Inc.*, No.15-2963, 2016 WL 7187946, at *4-5 (E.D. La. Dec. 12, 2016)).

[70] *Id.*; *see also* Memorandum Opinion and Order Granting Defendants' Motion [29] for Summary Judgment and Denying as Moot Defendants' Motion [33] to Dismiss, *Tiffany Cook v. BP Explor. & Prod. Inc., et al.*, Rec. Doc. 36, Case 1:18-cv-367 (S.D. Miss. December 4, 2019) ("Cook Order") at 5-6.

[71] All BELO complaints are originally filed in the Eastern District of Louisiana where they are subject to a Case Management Order requiring certain initial disclosures from the parties prior to venue transfer. *See* BELO Cases Initial Proceedings Case Management Order No. 1, *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, as Amended, Rec. Doc. 14099, 2:10-md-02179 (E.D. La. Mar. 16, 2018). As part of those core disclosures, each BELO plaintiff is required to produce the diagnosis upon which they base their BELO Complaint and to identify the medical provider who diagnosed them. *Id.*

Plaintiffs are thus unable to establish through admissible evidence the critical fact that valid diagnoses of their asserted LMPCs exist, as required by the MSA. Because the foundational evidence in each of the 236 Plaintiffs' cases no longer stands, the Rules of Civil Procedure and federal law mandate that Nations dismiss these suspect BELO lawsuits. Absent that action, this Honorable Court has the inherent power to address and resolve these issues.

## B. The Nations Syndicate Forms Are Unauthenticated and Inadmissible Hearsay.

The Nations Syndicate Forms are unauthenticated hearsay evidence. As such, authentication of the reports and an exception to the hearsay rule are required as conditions precedent to their admissibility. Fed. R. Evid. R. 802, 901(a). Thus, first, the Nations Syndicate Forms must be authenticated by someone with personal knowledge of their original content who can verify that each one is (in form and substance) what Nations claims it to be.[72] They are wholly inadmissible without such preliminary proof. However, authenticating any forms created by the Nations Syndicate is (by the very nature of the scheme itself) inherently impossible. Both Drs. Hoover and Martin have sworn under oath that:[73]

- They do not have a physician-patient relationship with Nations clients they evaluated.

---

[72] *Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) (affirming the trial court's exclusion of records purportedly relating to the patient's medical treatment where the records were not "sufficiently authentic to warrant determination concerning admissibility"); *Rodriguez v. Smithfield Packing Co, Inc.*, 545 F. Supp. 2d 508, 514-515 (D. Md. March 14, 2008) (granting summary judgment and excluding medical documents where none of the documents had been authenticated by the declarants, and, where, as here, the genuineness of the purported medical documents was otherwise doubtful); *Joseph v. Government of the Virgin Islands*, 2005 WL 1353393, *617 (D.V.I. App. Div. May 26, 2005) (noting that "possession by one doctor of medical records from a second doctor does not incorporate the document into the first doctor's business records") (reversed on other grounds). The hearsay and best evidence rules also preclude the admissibility of the Nations Syndicate forms; but, the initial hurdle of authentication is fatal to this proffered evidence eliminating the need to address those issues herein. *See Belber*, 905 F.2d at 552 ("authentication is a necessary but not sufficient condition precedent to admission); *Moreno v. Los Angeles County Sheriff's Dept.*, 2015 WL 4652637, *11 (S.D. Cal. Aug. 3, 2015) (excluding medical records as inadmissible hearsay where the records were not accompanied by a declaration from a custodian or other qualified witness as required by FRE 803(6)(d) and witness lacked personal knowledge of the records, including their creation and the circumstances of their composition).

[73] *See* Hoover No Records Affidavit at 1; Martin No Records Affidavit at 1; discussion *supra* Sections II.B.1-III.B.2; Hoover Dep. at 11:17-21, 18:14-19:3, 68:8-10, 89:9-19, 118:5-25; 119:1-4; Martin Dep. at 11:5-17, 16:6-12, 32:10-33:6, 42:11-43:1, 55:18-24.

- They do not (and did not) maintain Nations client records with the files of their regular medical practice. Nations clients did not fill out intake paper work or any standard forms utilized in their offices.
- They did not know who they evaluated, did not maintain a list of Nations clients they saw, did not confirm the identity of any Nations client they examined, and did not have a personal recollection of their findings as to any of the Nations client.
- They intentionally, and by agreement with Nations, did not maintain originals or copies of any Nations Syndicate Forms they may have signed.
- If provided with an alleged original (or copy) of a Nations Syndicate Form purportedly signed by them, they are unable to swear under oath that the content and substance of that form are accurate, complete, and have not been altered or amended in any way.
- ***They are "unable to authenticate any original or copy" of any Nations Syndicate Form purportedly signed by them***.

Thus, the Nations Syndicate Forms do not constitute potentially self-authenticating exceptions to the hearsay rule such as medical records[74] or business records.[75] Drs. Hoover and Martin lack personal knowledge with respect to the content and substance of the findings and opinions in any of the Nations Syndicate Forms they purportedly signed. They do not know who they evaluated, what symptoms (if any) were actually presented to them during that evaluation, or what findings and diagnostic opinions they made based on that evaluation. There is no way to tell whether they actually evaluated the person whose name is on the Nations Syndicate Form. There is no way to tell if the history of present illness, chief complaints, symptoms, findings, circles, and/or dates on the forms have been changed or altered. There is no way to tell whether

---

[74] The Nations Syndicate Forms are essentially expert reports. "Obviously a writing is not admissible ... merely because it may appear upon its face to be a writing made by a physician . . .. It must first be shown that the writing was actually made by or under the direction of the physician at or near the time of his examination of the individual in question [in the regular course of his practice] and also that it was his custom in the regular course of his professional practice to make such a record." *Masterson v. Pennsylvania R. Co*., 182 F.2d 793, 797 (3d Cir.1950).

[75] The forms do not constitute exceptions as a doctor's medical or business records because: (1) there is no doctor-patient relationship between Hoover, Martin, and the Nations clients; (2) the forms were not maintained by either Dr. Hoover or Dr. Martin as business records (all original reports were allegedly returned to Plaintiffs and Plaintiffs' counsel); (3) the forms were not created, saved, stored, or kept by Dr. Hoover or Dr. Martin in the ordinary course of their business; (4) the forms were not saved, stored, or kept in the same manner as Dr. Hoover or Dr. Martin patient records; and, (5) no one with personal knowledge is able to certify the records or testify as the facts required to meet this exception. *See* discussion *supra* Section II.B.1-III.A; *see also U.S. v. Veytia-Bravo*, 603 F.2d 1187 (5ᵗʰ Cir. 1979), *cert. denied*, 444 U.S. 1024, 100 S.Ct. 686, 62 L.Ed.2d. 658 (1980) ("The primary emphasis of rule 803(6) is on the reliability and trustworthiness of the records sought to be introduced, and the trial judge exercises broad discretion in determining the inadmissibility.").

signatures have been copied, traced, or pasted electronically. Because Plaintiffs cannot authenticate these forms and no exception exists under the hearsay rule, they are irrefutably inadmissible and, therefore, must be excluded by this Court. Fed. R. Evid. R. 901(a), 802.

### C. Pursuant to *Daubert*, the Unreliable Opinion Testimony of Drs. Martin and Hoover, Including the Findings and Diagnoses Contained in the Unauthenticated Nations Syndicate Forms, Must be Excluded.

In a BELO action, a plaintiff must prove, *inter alia*: (1) that each alleged LMPC was correctly diagnosed, and (2) that each alleged LMPC was legally caused by spill-related exposures.[76] And, as in other toxic torts cases, a BELO plaintiff must rely on expert testimony to prove their medical diagnosis and causation.[77]

Rule 702 establishes the gate-keeping responsibilities of this Court as to the admissibility of expert testimony, including that in the form of written reports like the Nations Syndicate Forms at issue here. Fed. R. Evid. 702; *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321-22 (3rd Cir. 2003) (*citing Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). To be admissible, medical diagnoses must meet the requirements of Rule 702 as well. *Rodgers v. Hopkins Enterprises of MS,* LLC, No. 17-6305, 2018 WL 3104288, at *5 (E.D. La. June 21, 2018) ("In the context of this case, any testimony regarding [a doctor's] medical evaluation or treatment of [a plaintiff], including [the plaintiff's] diagnosis or the cause of his injuries, is an expert opinion under Rule 702."). That rule specifies as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

---

[76] *Piacun v. BP Exploration & Prod., Inc.*, No. 15-2963, 2016 WL 71879446 at *4-5 (E.D. La. December 12, 2016).

[77] *See* discussion *supra* Section II.B.4. *Seaman v. Seacor Marine LLC*, 326 F. App'x 721, 723 (5th Cir. 2009) (noting that expert testimony is required to establish causation); *United States v. Crinel*, No. 15-61, 2016 WL 6441249, at *7 (E.D. La. Nov. 1, 2016) ("[A]n opinion regarding a patient's medical diagnoses or prognoses 'falls within the scope of expert testimony under [Federal Rule of Evidence] 702'" (quoting *Barnes v. BTN, Inc.*, 2013 WL 1194753, at *2 (S.D. Miss. Mar. 22, 2013), *aff'd*, 555 F. App'x 281 (5th Cir. 2014)).

> (1)    the testimony is based upon sufficient facts or data,
>
> (2)    the testimony is the product of reliable principles and methods, and
>
> (3)    the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

These gate-keeping considerations ensure that an expert opinion is relevant and "rests on a reliable foundation." *Daubert*, 509 U.S. at 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert*, 509 U.S. at 589). In order to be considered "reliable," the second prong of the *Daubert* analysis, an expert's testimony or opinions must be based on "sound science [requiring] some objective, independent validation of the expert's methodology." *Id.* at 591. In making the reliability inquiry, it is a court's responsibility "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Because it ensures integrity in the realm of expert testimony, it is this second prong of the *Daubert* analysis that ensures the opinions (including "diagnoses") of doctors like Drs. Hoover and Martin, who are involved in suspect, attorney-controlled diagnostic schemes, are not admissible.

> **(a) Drs. Hoover and Martin do not qualify as experts in the diagnosis, treatment, or causation of the pre-populated conditions on the Nations Syndicate Forms.**

The fundamental predicate for the admission of expert testimony is the qualification of the person offering the opinion. Here, neither physician is qualified as an expert in the diagnosis, treatment, or causation of the pre-populated conditions on the Nations Syndicate Forms. Drs. Hoover and Martin conceded as much throughout their depositions, stating they did not intend to testify (and would not qualify) as experts on these matters in federal court. *See* fn. 53-54 *supra*. On this point, BP agrees.

Drs. Hoover and Martin cannot accurately define the conditions they purportedly diagnosed. *See e.g.* fns. 19, 53-54 *supra*. They did not know and did not apply the diagnostic criteria generally accepted in the medical community for those conditions. *See* discussion *supra* Sections II.B.1-III.B.2. They have never researched or published on these topics. *Id.* With respect to causation (and the chemicals/materials to which plaintiffs allege exposure), neither Dr. Hoover nor Dr. Martin know the identity of any of the chemicals or substances to which the plaintiffs allege exposure - much less their toxicity, ability to cause certain conditions, or even the dose of a particular plaintiff's exposure. *See* discussion *supra* Section II.B.4.

### (b) Drs. Hoover and Martin failed to employ any discernible methodology in performing their work with the Nations Syndicate.

Drs. Hoover and Martin failed to effectively employ any defined or consistent methodology when performing their work with the Nations Syndicate. Each candidly confessed that whatever steps they took in reaching their decision to sign-off on the Nations Syndicate Forms, they would not be able to withstand the rigors of federal court scrutiny. *See* discussion *supra* Sections II.B.1-III.B.2. In performing their work with the Nations Syndicate, they simply did not follow the standards generally accepted in the medical community for establishing medical diagnoses. *Id.* The admissions of Drs. Hoover and Martin collectively demonstrate that:

(1)     The "evaluations" were scheduled, arranged, and paid for by Nations.

(2)     Nations dictated the conditions to diagnose, set forth the symptomology to consider, and provided the machines for testing/test results.

(3)     The doctors did not review any actual medical records relating to the Nations clients.

(4)     Nations supplied inadequate, unverifiable "medical" information (collected by unknown Nations case managers and pre-populated on the Nations Syndicate Forms).

(5)     The doctors were instructed to report symptoms that *were not actually present on physical exam; and, they did*.

(6)     The doctors failed to use any "diagnostic criteria" other than that dictated by Nations on the Nations Syndicate Forms.

(7)     The doctors have no idea what their findings were for any of the Nations clients.  They cannot authenticate any report they purportedly signed.

(8)     The doctors would not qualify as experts in federal court on the issues of diagnosis and causation in these BELO cases.

*See* discussion *supra* Sections I-III.B.2.  The aforementioned concessions all serve to render the opinion testimony of Drs. Hoover and Martin, including that in the form of their findings and "diagnoses" in the unauthenticated Nations Syndicate Forms, unreliable and, thus, inadmissible under Fed. R. Evid. Rule 702.[78]  "Where an expert's opinion is based on insufficient information, the analysis is unreliable." *Paz* 555 F.3d at 388.  "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."  *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).  As to the facts underlying an expert's opinions, in *Williams v. Hargrove*, 2018 WL 1075041, *3-*4 (S.D. Miss. Feb. 2, 2018), the court found that an expert's analysis and conclusions were unreliable when the facts on which the expert based his analysis were spreadsheets prepared by plaintiffs' counsel which had been demonstrated to be biased and inaccurate.  *See also Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000) (holding that an expert's reliance on "the plaintiffs' compilations of data ... gives rise to a 'common-sense skepticism' regarding the expert's evaluation"); *McElroy v. Evanston Ins. Co*., No. 3:14-CV-180-CWR-FKB, 2016 WL 2726859, at *4 (S.D. Miss. May 6, 2016) (holding that relying on a factual foundation that was unreliable, even if the expert did not know it was unreliable, rendered the opinion unreliable).  Moreover, when an expert's testimony is "not based upon the facts in the record but on altered facts and

---

[78] *See* Banegas Order at *3; *Daubert*, 509 U.S. at 590 (1993) (to be reliable under Fed. R. Evid. 702, expert testimony must be "grounded in the methods and procedures of science"); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009) (district court properly excluded expert testimony that was not based on methodology generally accepted in the medical community).

speculation designed to bolster [a party's] position," the trial court can exclude it. *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1331 (5th Cir. 1996).

## V.    CONCLUSION

The testimony and evidence set forth herein suggest a scheme designed to manufacture claims against BP.  It also renders the sham diagnoses at issue in these matters unreliable and inadmissible under Rules 702, 802, and 901 of the Federal Rules of Evidence.  BP, therefore, respectfully prays this Court enters an order: (1) excluding the opinion testimony of Drs. Hoover and Martin (including that in the form of the purported findings and "diagnoses" contained in the unauthenticated Nations Syndicate Forms produced by Plaintiffs in these matters) as unreliable and inadmissible under Rules 702, 802, and 901 of the Federal Rules of Evidence; and, (2) requiring Plaintiffs whose BELO lawsuits are founded upon these "diagnoses" to show cause why their claims should not be dismissed.

THIS, the 11th day of January, 2020.

Respectfully submitted,

*/S/ Marcy B. Croft*
*/S/ Clare S. Millette*
_____
Marcy B. Croft (MS Bar #10864)
Clare S. Millette (MS Bar # 102580)
Rebekah Clayton (MS Bar # 103442)
Christi G. Jones (MS Bar # 103004)
Ericson Enger (MS Bar # 105808)
Jessica Rice (MS Bar # 105722)

**OF COUNSEL:**
**MARON MARVEL BRADLEY ANDERSON & TARDY LLC**
200 South Lamar Street, Suite 550 North
Jackson, MS 39201
Telephone: (601) 960-8630
Telefax: (601) 206-0119
mcroft@maronmarvel.com
BP Exploration & Production Inc. and BP America Production Company

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 11th day of January, 2020, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all counsel of record registered to receive electronic service by operation of the Court's electronic filing system.

*/S/ Marcy B. Croft*
*/S/ Clare S. Millette*

_____
Marcy B. Croft (MS Bar #10864)
Clare S. Millette (MS Bar # 102580)